UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

v.

JONATHAN RHOADES,
    *Defendant*.

No. 3:15-cr-206 (JAM)

### ORDER DENYING MOTION TO SUPPRESS

The United States has charged defendant Jonathan Rhoades with knowing distribution of child pornography. Defendant moves to suppress statements he made to police officers when interviewed in a conference room at an insurance company where he worked. He argues that his statements were obtained in violation of his *Miranda* rights and were the product of police coercion. *See* Docs. #34, #48 at 4. Following a suppression hearing, I conclude that defendant's rights were not violated, and I will deny defendant's motion to suppress.

#### BACKGROUND

The facts surrounding defendant's interview with the Connecticut State Police are largely uncontested; what follows are my findings of fact based on the record and testimony from the suppression hearing.[1] In early 2015, the Connecticut State Police obtained a search warrant for defendant's home where the police believed there was a computer containing evidence of child pornography. Defendant was not home when the police executed the search warrant at his home on March 10, 2015, and so Detectives David Aresco and Jonathan Carreiro sought to find him in order to question him about their investigation. The detectives ended up in Windsor,

---

[1] I rely on facts as set forth in the suppression hearing testimony of James Thomas, Philip Kennedy (Doc. #48), Detective David Aresco, and Detective Jonathan Carreiro (Doc. #49), as well as the filed affidavit of defendant (Doc. #37), who did not testify.

Connecticut, at the offices of The Hartford where defendant worked as an IT vendor. On their way to Windsor, they called The Hartford to ask whether its security staff could secure a conference room to use for purposes of meeting with defendant.

The detectives arrived at The Hartford and met with James Thomas, Senior Investigator at The Hartford, and with Philip Kennedy, Manager of Corporate Security. The detectives told Thomas that defendant was accused of child pornography and other computer crimes, but would not be arrested that day. Pursuant to company procedure, Thomas contacted a security analyst for The Hartford so that security staff could conduct a forensic investigation of any of The Hartford's equipment used by defendant. The detectives waited in the conference room on the first floor while Thomas and Kennedy went to the second floor to ask defendant to come to the conference room. Thomas and Kennedy were dressed in appropriate office attire, with no handcuffs or guns in their possession.

Thomas and Kennedy approached defendant at his cubicle, and Thomas identified himself and Kennedy as security and internal audit staff members for The Hartford. Thomas showed defendant his work badge, told defendant that there were detectives downstairs that would like to speak with him, and asked whether he would be willing to go with them. Defendant indicated his willingness and gathered his belongings. Thomas and Kennedy led defendant down a flight of stairs to the conference room, which was nestled near the back of an unused office suite area. *See* Govt. Ex. 2.

In the meantime, the two detectives waiting within the conference room had pulled down opaque shades to windows that looked out to the parking lot, although the parking lot was still visible through the shades. On both sides of the door leading from the suite into the conference room were window panels stretching from floor to ceiling. The panels stretching down on either

side of the door to the floor were ridged, so the view through those windows revealed shapes and outlines, but was otherwise distorted. *See* Govt. Exs. 3–4.

Defendant arrived at the conference room to find the detectives inside, sitting at the long side of a conference table diagonally facing the door. Defendant sat at the head of the table also diagonally facing the door, with no obstacles between him and the closed door. From his seat at the conference table, defendant could see Thomas and Kennedy standing outside of the conference room, but they soon left the suite area for about ten minutes to take photographs of defendant's cubicle and revoke his access to the building.

Detective Aresco began the interview by explaining who he was and why he was there. Defendant was shown the detectives' badges. The detectives were not in uniform, and their guns and handcuffs—attached to their belts—were not visible.[2] Detective Aresco did not give defendant his *Miranda* rights, but he did indicate that defendant could terminate the interview if he wanted. He told defendant that the police were executing a search warrant at his home, that contraband had been found, and that he knew of defendant's prior conviction in 2005 related to child pornography. He noted that defendant was not currently under arrest, but indicated that the police were in the process of applying for an arrest warrant.

During the 50-minute interview, which the detectives described as conversational and polite, defendant made allegedly incriminating statements—relating either to his 2005 conviction or the conduct charged in this case. After the interview, he refused to sign a written statement, but he did consent to the detectives' search of his car. Defendant and the detectives left the

---

[2] The detectives testified that, when entering private businesses, they usually cover their weapons, badges, and handcuffs. Doc. #49 at 10, 113–14. They did not recall whether their guns were visible on the day in question, but I find that they were not visible because I credit their testimony that they would have covered their belts, and defendant's affidavit is ambiguous, at best, about that point. *See* Doc. #37 at 1 ("I observed the [detectives'] formal law enforcement adornments. I was shown police badges.").

conference room and, with Thomas and Kennedy, walked out to defendant's car, where the detectives looked through the windows and peered into his trunk, but otherwise did not do a thorough search. Defendant was given a copy of the search warrant for his residence, of the court order that had been sent to defendant's internet service provider, and of Detective Aresco's business card. Defendant left work and, a few days later, checked himself into a mental hospital.

Thomas described defendant that day as having "no expression," and Kennedy described him as having an abnormal, "bland" expression. In his affidavit, defendant notes that, at the time of the encounter, he suffered from anxiety, depression, and felt suicidal. Detective Aresco testified that people accused of child pornography may be inclined to commit suicide; although defendant had answered questions politely, coherently, and "appropriately" during the interview, when Detective Aresco called defendant a week later and got no response, he began calling hospitals because he had a feeling that something was not right and he feared that defendant might have attempted suicide. Defendant was ultimately arrested on March 18, 2015.

## DISCUSSION

Defendant moves to suppress the statements he made to the police on two grounds. First, he contends that he was "in custody" at the time that he was questioned by the police, such that his statements were unlawfully elicited without warnings in violation of his *Miranda* rights. Second, he contends that his statements were otherwise made because of police coercion.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court famously ruled that the government may not use a suspect's statements against him at trial if the statements were the result of custodial interrogation and if the police did not employ appropriate procedural safeguards to protect the Fifth Amendment privilege against self-incrimination (such as to administer warnings and to obtain a knowing, intelligent, and voluntary waiver of the suspect's

rights to silence and to counsel). *See, e.g.*, *United States v. Medunjanin*, 752 F.3d 576, 585–87 (2d Cir. 2014) (discussing *Miranda* rule). As noted, the protections recognized under *Miranda* apply only if a suspect is subject to interrogation while in police custody.

In *United States v. Faux*, 828 F.3d 130, 134–36 (2d Cir. 2016), the Second Circuit recently discussed at length the *Miranda* "in custody" requirement. As the Court of Appeals explained, "'custody' for *Miranda* purposes is not coterminous with . . . the colloquial understanding of custody." *Id.* at 135. Instead, "the test for determining custody is an objective inquiry that asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Ibid.* "Relevant considerations include: (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." *Ibid.*

Based on my consideration of all these factors, it is very clear to me that defendant was not "in custody." He was neither formally arrested nor subject to conditions remotely akin to a formal arrest. He was questioned by consent after he agreed to accompany the security staff to the conference room with knowledge that the police wanted to talk to him. The questioning did not take place at a police precinct but at a corporate conference room at defendant's place of employment. The length of the interview was less than one hour. The police did not display their weapons or engage in any physically intimidating conduct. Defendant was told he could

terminate the interview if he wished to. Defendant was not "in custody" for purposes of the *Miranda* rule.

For the same reasons, I conclude that defendant's statements were plainly not the product of coercion. *See United States v. Taylor*, 745 F.3d 15, 23–24 (2d Cir. 2014) (discussing the "voluntariness" standard and factors to be considered). This was a consensual encounter with the police, and the police acted entirely appropriately and professionally in seeking to arrange an interview with defendant without the use of coercive or improper pretenses or techniques. There is no convincing evidence to suggest that defendant's will was somehow overborne by the police or by any of the corporate officers who assisted the police on the day of the interview. I have considered all of defendant's arguments as set forth in his papers and at the suppression hearing, and I conclude that they are without merit.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress (Doc. #34) is DENIED.

It is so ordered.

Dated at New Haven, Connecticut, this 9th day of December 2016.

                                              /s/ *Jeffrey Alker Meyer*
                                              Jeffrey Alker Meyer
                                              United States District Judge